CASE 21-5276 CITIZENS FOR RESPONSIBILITY AND ETHICS IN WASHINGTON APPELLANT v. UNITED STATES DEPARTMENT OF JUSTICE MS. LUCKINHOUSE FOR THE APPELLANT MS. MUNDELL FOR THE APPELLATE Good morning, Ms. Luckinhouse. Good morning. May it please the Court, Jessica Luckinhouse, on behalf of Appellant Citizens for Responsibility and Ethics in Washington. In this case, the Bureau of Prisons adopts an interpretation of FOIA Exemption 4 that transforms strong public interest into a basis for withholding information rather than disclosure. Such a result earns FOIA's pro-transparency purpose its head. In granting summary judgment for the Bureau, the District Court erred in two ways. First, the identities of the Bureau's pentobarbital contractors are not commercial information. Because the term commercial modifies the term information in Exemption 4, the information must itself be commercial to fall within the exemption. But the Bureau instead relies solely on the attenuated downstream consequences of disclosure arising from fears of negative publicity. Second. The information has to do with the parties to a contract, does it not? That's right, Your Honor. Doesn't that sound pretty commercial? People entering contracts are in commerce, but isn't information related to that contract commercial? But the information being held, the name itself, the reals, is simply in that case that this company or companies are a government contractor. Something that is true of every government contractor. We're all very familiar with government contractors, Your Honor. Something that is presumptively public, and again would be true of every government contractor. Suppose we were to accept that a business's name may sometimes be commercial, but sometimes not. What's the line that you're relying on here to distinguish when the business name, let's say in the context of contracting with the government, when is it commercial, when is it not? Two responses, Your Honor. The first is that we need to look at the information itself, not solely at the consequences of disclosure, and that's all we have in this case from the Bureau. Right. So I understand that you're arguing that there are two steps and that under Baker and Hostetler we at least have to determine whether the information is in and of itself commercial before we look also at the downstream consequences. What I'm asking is really focusing on that first aspect. Judge Santel has posited, well, if it's a party to a contract, why isn't that commercial? You say, no, that's not enough. And I'm saying, well, what is the inquiry that you're proposing that we make in determining whether that information is in and of itself commercial? When looking at whether the information is itself commercial in the context, one, we want to see if the information reveals something else, not just the existence of the business or linking the business to its known business operations, but that it reveals something else about the business. And the epic case relied upon by the district court is a good example of this, where in that case, the identities of the participants in the government's cybersecurity program, according to declarations submitted by the government, served as an admission of cyber vulnerability. So that revealed something about the business and its operations. It's how it responds to vulnerabilities to cyber attacks. That is something more than just the name of the business or the fact that it does. Does that not suggest that the inquiries here, I would suggest both commercial and confidentiality, are a case specific rather than a generic or a matter of law kind of thing. That sometimes the name revelation of the company name can be a commercial and be a confidential matter. That's right. This is a case by case. So what we're trying to get at, I think, is what would you say would be enough in this case if it isn't enough to have a downstream consequence? In this case, the primary problem is that the Bureau relies only is attenuated downstream consequences coming from reputation. What more do they need then? There was nothing from the Bureau about how those consequences are about the nature or function of the information itself. The only evidence offered by the Bureau was related to these consequences. And we think according to the plain text of Exemption 4, you cannot only rely upon consequences themselves to transform noncommercial information into commercial information. Well, you all, as crew, define information connected with the exchange of goods. So do we need to, one, provide me an example of what you mean by that? Because, again, these questions are going to, well, what is your definition of commercial? And then, secondly, do we have to accept your definition in order to award to you? Because the underlying district court opinion used dictionary definitions, et cetera. We take the second question first. No, I don't think you do have to accept our definition of commercial. It's enough in this case that the Bureau didn't undertake the correct inquiry, that the Bureau never looked at the information itself, but only these attenuated downstream consequences. With respect to the meaning of commercial, dictionary definitions have said related to commerce exchange of goods. That is in some ways circular, and this court has provided guidance about what that means. For one, that we look at the information itself and its nature or function, but also there's a core set of information that the court has repeatedly recognized to be commercial. Sales statistics, profits and loss, things that relate to the business's everyday operations. And here we don't have any indication, again, from the Bureau at summary judgment, as to what the nature or function of this information, the names of these contractors, would be. All we have are these downstream consequences. But would that be a reason to remand in that regard so that we got more qualifying information about what was actually confidential out of that huge list? I mean, the district court only seemed to list a few things, but I'm not sure that the record is necessarily complete about what qualifies as confidential. The Bureau had its chance at summary judgment. The parties did cross move for summary judgment. And the Bureau had an opportunity to submit declarations and briefing. We think it would be a waste of judicial resources, not efficient, to go back to the district court and give them another bite. If we are determining whether this is an efficient evidentiary record, would it not be a good idea to look at the purpose of the statute? That is, for the purpose of the statutory exemption. That would be a good place to start, Your Honor. Yes. Right. It did not appear that the purpose of that is to meet the situation in which the government has someone has had to give up information to the government to deal with the government. And that release of that information could be harmful to the non-governmental entity in its commercial life. That's not the reason that we have the exemption in the first place. Well, the purpose of FOIA, as you know, is to open up... No, let's talk about the purpose of this particular exemption. We'll get to the purpose of FOIA in a moment, but let's go on to the exemption. And in this case, it points you to the difference between Exemption 4 and Exemption 6 and 7, where in Exemption 4, Congress has decided to protect from disclosure commercial information, but not any information, the disclosure of which would lead to any type of business consequence. Why did you think Congress wanted to protect that information then? What is the purpose in protecting it unless it is to protect the information supplying entity or person from adverse consequences as a result of the disclosure? It is to protect the company's confidential commercial information. But because Exemption 6 and Exemption 7 are written to specifically take account... Let's just look at Exemption 4 for a moment. Disclosure? Let's just look at Exemption 4. Why isn't this within that purpose that you admit is the Congressional purpose? That's one reason, I think, why we do not look at the downstream attenuated consequences. Here, the purpose of FOIA is to open the government to agency action, and in cases where... The purpose of FOIA, we've said lots of times, is so that people can see what the government is up to. In this case, you're trying to use it to see what somebody other than the government, the contracting party... This really isn't inconsistent with the purpose of FOIA, is it? Respectfully, Your Honor, we are trying to see what the government is up to. The revelation of the identity can help other organizations, can help the public determine whether the government has contracted with a reputable supplier, which is core to what the government is up to. And that there are reputational concerns does not change our view of the analysis. Because FOIA is most important in cases in which the programs at issue are unpopular. Popular programs, the government is willing to share that information, but for unpopular... No, no, no, no, no, no, no. The government is not always willing to share information about popular programs. The most often used exemptions are the criminal investigation and the national security, both of which are pretty popular most of the time. And yet, FOIA protects certain aspects of those. You can't say this is on a popularity matter. The government doesn't want to reveal what's confidential. It's important to force the government to reveal anything it doesn't want to reveal. But we think particularly important in this case where the basis the government relies upon is public scrutiny that would follow the disclosure. Where, again, the purpose of FOIA is to create an informed public. And in this case, would make the informed public a cognizable harm under FOIA. Ms. Lueckenhaus, you argued that if the Bureau's showing is inadequate, that there's no... It would be inappropriate to remand for it to supplement its justifications. We do sometimes remand and allow the government under FOIA to supplement justifications. Do you have a good case for us, a circumstance in which we didn't remand because the government had already had a chance to offer its justification? I will answer your question. I'm just noticing my rebuttal time. We are not sticklers on time. If we have questions and are finding it useful, don't worry about it. I'm aware that the court does often do that. Just recently in the OLC memo case that came out earlier, the court did decline to remand and give the government another opportunity to provide additional declarations and information. So remand is an option, but we think in this case not a necessary one because the government had an opportunity. On understanding whether information is commercial or not, do we look at the ordinary operation of the business and how it treats this information generally? Or do we only look at this one contract? What's the frame factually for assessing whether the information is commercial or not? This is what would have been helpful to get from the Bureau, Your Honor, something about the help with the assessment of the nature or function. You could imagine different interests depending on what the business's operations are, how well known they are, how important the government is as a customer. But the Bureau didn't give us anything with which to base that assessment on because they looked only at these reputational downstream consequences. I had a question. I know you conceded with respect to the business identity that it's confidential, so that's not an issue here. But I'm curious sort of when and why a business name might be confidential, just to understand your thinking about that because it's one of the two aspects of the test. I mean, to me, the concession that it's confidential suggests that you are looking at this as contract-specific. Because unless these are companies that have been created for this purpose, presumably they're companies that don't keep their business identity confidential in their other activities. So I'm just sort of struggling a little bit with what your concession on that might imply about the analysis of the commercial nature. It's true that we did not dispute the identity. And I think looking at the government's declarations on the identity point is they did offer… You mean on the confidentiality? On the confidentiality point, they did offer evidence in particular that the contractors asked for the identifying information to be kept confidential, and the Bureau made that assurance. So I think that that's an important thing to consider in the confidential context. But we don't believe that that would govern in the commercial context whenever, if something is commercial, whenever the company wants to keep it private, that simply collapses the commercial and the confidential inquiries. You indicated a public domain doctrine that you did so in your reply brief. Is that something that we should be considering then? We raised in reply because we only learned about the disclosure from the government's opposition brief or during the appellate briefing in this case. We do think that to the extent that the Bureau has publicly disclosed these particular types of information, the substance concentrations and the expiration dates publicly before, we know from the government's bond index that it continues to withhold that same type of information in other documents. The belief reversal is appropriate as to those particular records to release that information that was already released publicly. On the contract terms, which we haven't yet talked about this morning, there you make the opposite concession. You concede that they're commercial, but argue that they are not confidential. And the government makes a somewhat novel argument there. Instead of directly showing that these are terms that are customarily and actually kept private, instead the government adopts what I'll call a two-step approach. In which it says that the contractors customarily and actually keep identifying information private and that the withheld information is in fact identifying. And as I read your brief, you're not challenging whether the Bureau can adopt that two-step approach, whether that's sort of an adequate stand-in for the confidentiality test. You're only really saying that if it adopts that approach, it has to justify both steps. That's right. All right, we will give you a little bit of time for rebuttal. Thank you. Good morning, Ms. Mundell. Good morning, Your Honors. May it please the Court. Amanda Mundell on behalf of the Department. I want to start by clarifying two important aspects of the tests that apply to these categories of information. So the first category that the Court was discussing with counsel was the names of these entities, the names of the companies, and why that information is commercial information. Now, the test that CREW has advocated for is a test that asks the Court to look at whether this information is in and of itself commercial, full stop. But I want to make clear that from this Court's case law, the sentence doesn't end there. It's in and of itself commercial in nature or in function. And this Court has clarified what it means to be commercial in nature or commercial in function. The Court has explained that commercial in nature means connected to a commercial enterprise. And, of course, the names of these entities are not being disclosed in a vacuum. Disclosing the names says something about their business operations, their commercial enterprise. And the other aspect of the test, whether it's commercial in function, this Court explains turns on whether there's a commercial interest at stake in the information's disclosure. And that's where the commercial consequences really come into play. Because to assess whether a company has a commercial interest at stake in disclosing the documents, we look at what happens when the documents are disclosed. But I think you're referring to language from the Home Builders case, which sort of parses the in nature and in function. And in talking about the function there, and that was the owl-citing information, it said that there was no evidence that the parties who provided the owl-citing information had a commercial interest at stake. And I think the difficulty for your position is that it seems very broad that any risk of embarrassment for a company or any reputational exposure would become commercial. And that seems boundless. And it does seem somewhat in tension with the disclosure notion of FOIA. And so I just wonder if you can give us some limiting principle, if we were to accept your assertion that information is in and of itself commercial, if you could embarrass the company. Absolutely, Your Honor. And I want to be clear, the consequences at issue here are not just reputational harm, and they're not attenuated, as Caru has suggested. In fact, as our declarations explain, I think we'll find that at JA 112 to 115, and again at 134 to 135, we don't have to imagine what commercial consequences happen when the identities of these companies become public. Time and again, the moment the identities of these suppliers, for instance, a Texas supplier or others, becomes public, that supplier withdraws from the market altogether. But that's a different question, whether the supplier says, from a public relations perspective, this is not a message that I want to associate myself with. We don't actually know whether, had they stuck it out, those companies would have suffered any loss of custom. All right. Number one, I think the loss here is that they cease selling these drugs to the state or federal governments. And that is a demonstrable loss in their profits. It's money that they're not making. But number two, some of those examples do identify commercial losses associated with boycotting or negative press. And one of those would be lawsuits. Of course, lawsuits are expensive. So I don't think that this is – What if the facts showed that their pulling out of that contract led to congratulatory uptick in the pat on the back kind of additional business? Still commercial? Your Honor, again, I don't think it's just negative commercial consequences that matter here. It's any time someone has a commercial stake in the information, there are commercial consequences. Of course, we know that there's no positive commercial consequences associated with these identities being revealed. Do we have any case where the disclosure risks positive commercial consequences? I'm not aware, Your Honor, because I doubt that these companies would assert confidentiality over that sort of information. They haven't asserted confidentiality. Here's the government. I mean, there are cases in which the businesses have submitted declarations, but this is not such a case. Well, Your Honor, the businesses haven't submitted declarations because to do so would obviously identify them. They haven't sought to do it synonymously. No, they have not, Your Honor. But based on the declaration, the declaration asserts that these businesses keep this information confidential. It's not the government. Only in the context of this contract. The same question for you as I had for Ms. Lueckenhaus, which is, do we only look at the universe of this contract, or do we look at whether these are secret companies generally? Well, Your Honor, I think that gets into the confidentiality prong. I think Argus Leader helps us answer that question. So under Argus Leader, the question of whether information is confidential is whether the owner customarily and actually treats it as private. There really aren't any other instances. Confidentiality is conceded on this, on the identity point. But the commercial nature of the information generally, how do we assess that? More broadly or just in the context of this? Your Honor, I think it's a case-by-case basis. And here, the declarations establish that this information is commercial, either because it reveals a business relationship that these companies are suppliers of pentobarbital or because of the commercial function and the consequences that we've discussed. I want to turn to the other. But do the declarations address each of the discrete contractual information in terms of being confidential? Yes, Your Honor. So that turns to the second point, this confidentiality aspect. I want to start by clarifying the test or at least clarifying what the government has, either the representations we've made in our brief, because I don't know if it was totally clear at the first phase of this argument. But unlike Crew's assertions, we don't think there needs to be a showing that the company protects this information because it's identified. Under Argus Leader, what matters is whether the company customarily and actually treats the information as private, full stop. And as the declarations explain at JA 112, this information is customarily and actually treated as private, all of the information that Crew has sought. Now, we also took the second step, Judge Childs, and explained how this information could be identifying. For instance, we gave examples about quantity and dates of purchase being compared to DEA reporting logs or DEA databases at JA 134 to 135 and how other contract terms could be pieced together with other bits of information to paint a picture of who these companies and suppliers are. But you're also being accused of having provided this information in other settings. I'm sorry, say that again. You're also being accused of having provided this information in other settings. And I think Your Honor is referring to the administrative record in the protocol litigation. So in that instance, this is a very particular case where the judge had ordered us to file the administrative record on the public docket. And a question arose in the case whether the pentobarbital to be used in the executions was expired. We put in lab reports that had redacted identifying information about employees and laboratories, but that revealed that the drugs were, in fact, not expired. And in hindsight, we should have sought a protective order because it was going to be on the public docket. But as the court may recall, this was extremely fast-paced litigation and, you know, very short turnarounds. And we saw exactly what the consequences were from putting that information on the public docket without fully redacting all of the categories like expiration dates and concentrations. Reuters put out an article that purported to identify the very laboratory that had created that report. And so that's why this information, even if we think we have to look at whether it's identifying, that's how we know that pieces of information that might on their surface not appear identifying can be pieced together with other sources of information to narrow down the scope for these suppliers and labs. We don't actually know if that's the methodology the Reuters article relied on. And you don't make an argument about the potentially identifying aspect of many of the kinds of information thought here. I think with drug prices, with dates, with substance descriptions, drug quantity, drug concentration, I don't see anything in the declaration addressing lot numbers, container units. Your Honor, so some of those I think the declaration does go into some specifics. At J134, for instance, the declaration says that if a particular company is known to price a substance in a particular way or test a product in a particular way, the manner in which it's described could be used to trace that substance to the particular provider. It's true that we don't go one by one to every single category and give an example of how that traces back, in part because it can be difficult in a vacuum to make that determination. But also because it's not up to the government to give the public a clear, you know, connecting the dots between information that we think is confidential commercial information protected under Exemption 4. But even if this court thinks that some of that information is not on its face identifying in a vacuum, I think this court is on solid ground in looking at how bits and pieces of that information, if it were to become public, could be pieced together with other information to then identify the companies. I think it's hard for you that you do appear to be relying exclusively on downstream consequences of disclosure. Am I wrong about that? I think there are consequences, but I don't know that they're really that downstream. Right, so the commercial consequences of disclosure. That's part of it, Your Honor, but going back to this commercial in nature test, that just looks at whether the information reveals that there's some connection to a commercial enterprise. That is so broad. The notion that anything connected to a commercial enterprise is, I mean, so much of it. When we look at the exemption, the first element is trade secrets, and then there's commercial and financial information. Don't we look at some likeness in the list and recognize the things that are similar to trade secrets? Internal, closely held value proposition information. How do we run our business? How do we make our product? What's our secret sauce? Not anything connected with the business. I think those are very clear examples, but this court has embraced the reasoning of the Second Circuit's decision in American Airlines, which addressed employee authorization cards. And the court said that those were readily considered commercial because labor unions are related to commerce and deal with the commercial life of the country. So you would read this as broad as the Commerce Clause. You're reading commercial in that sense. Your Honor, I agree. There must be a limitation here, but I think whatever that line is, we are clearly on the side of exemption for protections here because of how clear the consequences of disclosure are in terms of the effects on the commercial aspects of the business, but also what it says about their business. Why doesn't your test just allow the government and any business with whom it contracts to effectively contract around FOIA disclosure? Your Honor, two responses to that. Number one, I would resist the notion that this is our test as opposed to just what this court has articulated. Well, it's a further development of the test. I mean, we've all read Baker and Home Builders and Public Citizen and Argus Leader in all our cases. I think there are still meaningful limitations, Your Honor, and there are a few. Number one, confidentiality plays a meaningful limit here, and I don't think the government is in the business of just contracting with anybody and just shrouding the entire government operation in secrecy. That's not how it works. What's happening here is there is only one or two or a handful of suppliers that will even do business with the government here in order to carry out the government's functions. And so it's a different universe from just going out and contracting with any old company, even if there are other options available, but even if confidentiality isn't enough of a limit. But the government's interest in having this job done doesn't render the identity of the contractor with whom it works commercial. Not at all, Your Honor. But you're asking me what the meaningful limits are in terms of asserting this exemption. Yes. It's unlikely that this case is a repetitive case. You know, Pru references the Epic litigation. That's really one of the first instances where the identities of companies were at issue, and we haven't seen an uptick in companies refusing to do business with the government unless we promise to shroud their operations in confidentiality. But there's another important limitation, and that's that this court has held the government's feet to the fire to provide an adequate explanation in declarations to support their FOIA exemption assertions. And it has not been shy to say that what the government has shown is not enough. And, you know, we agree that it's not enough to make just a blanket statement, this is commercial and this is confidential. But we've made that showing. So that's another important limitation to ensure that Exemption 4 doesn't become boundless. But just returning to sort of this public policy notion, because I know that Pru has articulated it, we understand that there's a public interest in disclosure and open government and transparency. But this court has already recognized that Exemption 4 protects both the supplier of the information and their commercial interest, as well as the government as a recipient of that information. And to the extent that there is some balance between public interest accessing the information and protecting this kind of commercial information, Congress has struck that balance in Exemption 4. And this court need only to stick with its own cases in the language of Exemption 4 to agree with the district court that this information, the names of the entities, is commercial, and the other information, the contract terms, are confidential. All right, unless there are other questions, we just ask that you affirm. Thank you. Thank you. So did Ms. Lickenhouse have any additional time? We'll give you two minutes for rebuttal. Thank you, Your Honor. On the commercial prong, this court in Public Citizen has previously cautioned that not everything related to a business is commercial, something narrower than that. The language in Norton about connection to a commercial enterprise is, as with disclosure, part of its analysis of the information itself. The government's reliance upon attenuated downstream consequences is clear from pointing to the possibility of lawsuits or other things arising from reputational concerns. That gets far afield from the information itself and the key inquiry of what is the information's nature or function. You say attenuated downstream consequences. What if we were to disagree with you that they were attenuated but were, in fact, predictably quite immediate? For this purpose, this court has never held that consequences alone can transform non-commercial information into commercial information, so the Bureau's reliance only on downstream consequences would be fatal in this case without reaching the attenuation point. We do find that that attenuated chain of causation is another reason why the consequences relied on the Bureau here are insufficient. On the confidential point, just to note that the Bureau admitted here that it does not go one by one through the various firms to describe how they are identifying, and that's fatal here. Because the identifying nature of the information is the only support that the government has offered to bolster the conclusory allegation that all withheld information is customarily and actually kept private. Because the Bureau staked its withholding on that basis, that's why it needs to provide this substantiation. Thank you. I'll take the case under advisement.
judges: Pillard, Childs, Sentelle